The document below is hereby signed.

Signed: October 16, 2020



_S. Martin Teel Jr_

S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| DWAIN W. TATE, | ) | Case No. 19-00237 |
| | ) | |
| Debtor. | ) | (Chapter 13) |
| | ) | |
| ⸻ | ) | |
| | ) | |
| DWAIN W. TATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adversary Proceeding No. |
| | ) | 19-10009 |
| FAIRFAX VILLAGE I | ) | |
| CONDOMINIUM, *et. al.*, | ) | Not for publication in |
| | ) | West's Bankruptcy Reporter. |
| Defendants. | ) | |

MEMORANDUM DECISION AND ORDER
DECIDING REMAINING ISSUES ON UNDISPUTED FACTS

The second amended complaint filed by the plaintiff in this
adversary proceeding, Dwain W. Tate ("Tate"), the debtor in the
main bankruptcy case, includes a Count II seeking damages
pursuant to 11 U.S.C. § 362(k)(1) for the defendants' having
willfully violated the automatic stay ("Count II").  I previously
granted Tate partial summary judgment decreeing that, within the
meaning of 11 U.S.C. § 362(k)(1), the defendants "willfully"

violated the automatic stay.  The facts are not in dispute, and the parties agreed at the pretrial conference of May 6, 2020, that I could decide the claim based on the papers already filed in lieu of proceeding to a trial.

I

FACTUAL BACKGROUND

Tate is the son of Annetta M. Tate ("Ms. Tate"), who owned a condominium unit ("the Property") until her death.  After his mother passed away intestate, Tate, the heir to the Property, continued to make the monthly payments on the mortgage and condominium fees, but Ms. Tate remained the "named owner" according to the deed on file with the Recorder of Deeds and the Office of Tax and Revenue tax records.  Tate eventually fell delinquent on the payment of the condominium fees owed the condominium association, Fairfax Village Condominium I ("Fairfax Village"), a defendant herein.  Fairfax Village set a foreclosure sale for sometime in early 2017, and on January 17, 2017, Tate e-mailed Fairfax Village's attorney, Brian Fellner (who has acted as Fairfax Village's attorney herein and also as its trustee to pursue foreclosure for Fairfax Village's claim for condominium fees), telling him "I received a Notice of Foreclosure letter, addressed to my mom Annetta Tate, who is deceased.  And I was hoping we could work something out, other than auction and or sale of the condo.  In which I am still paying for."  The

2

foreclosure sale was called off in exchange for Tate making a
$6,000.00 payment.

However, in 2019, Fairfax Village, through Fellner, set a
second foreclosure sale for April 11, 2019, at 10:34 a.m.  On
March 12, 2019, Tate e-mailed Fellner, stating "I received a
Notice of Foreclosure letter, addressed to my mother Annetta Tate
who is deceased.  And I was hoping we could work something out,
such as a down payment and or payment plan.  Rather than
auctioning and or sale of the condo.  In which I am still paying
for."  No arrangement was worked out.  On April 10, 2019, Tate's
attorney, Harris Ammerman, e-mailed Fellner at 3:45 p.m.
advising: "I represent Mr. Tate who will be filing a ch 13
bankruptcy which will stay the foreclosure pending on behalf of
Fairfax Village Condo I; please provide me with any documents
that have been prepared to initiate the foreclosure sale process.
I will provide you with a bankruptcy case number as soon as the
case is filed."  Fellner e-mailed Ammerman back asking "You
represent Annetta Tate?" and at 3:52 p.m. Ammerman responded "Her
surviving son has an inchoate interest in the property and by law
he is entitled to obtain ch 13 bankruptcy relief and payoff all
outstanding financial obligations."  At 3:58 p.m., Ammerman e-
mailed Fellner the *Letters of Administration* issued by the
Superior Court of the District of Columbia on May 25, 2007,
naming Tate the personal representative of the estate of Ms.

Tate, deceased.  At 4:10 p.m., Fellner e-mailed Ammerman,
stating: "The property remains in her name 12 years later.  There
is no transfer or perfection of title.  Your client has a
potential interest in the property, but from my reading, his
bankruptcy does not stay my client's foreclosure against the
unit."  By a 4:53 p.m. e-mail, Ammerman responded: "I disagree
and if the property is sold at auction and you have notice of the
bankruptcy filing, I will ask the court to rule on a willful
violation of the automatic stay and seek damages see 11 USC
362(a}(3); I will email you with the bky case number."  Tate
filed his bankruptcy petition on April 10, 2019, at 6:57 p.m.  At
7:07 p.m., Ammerman e-mailed Fellner attaching a copy of the
bankruptcy case docket, and asking Fellner to advise of his
intentions regarding the sale.  At 8:27 p.m., Fellner responded
by stating that "Per my earlier comments, it is our position that
your client has no interest in this property.  You have provided
no citation otherwise," quoting a North Carolina decision that a
personal representative could not sue as to real property because
"realty vested in an heir with title relating back to the date of
death."  Fellner's e-mail then concluded:

> Based upon that language, my client intends to proceed to
> sale. It seems quite clear that the stay does not apply
> to property not owned by your client. Bankruptcy courts
> use state law to determine ownership of property. Here,
> though your client may have opened an estate for the
> deceased, he neither made the subject property a part of
> the estate, nor did he transfer the property into his own
> name in the ensuing twelve years (presumably to avoid

paying the transfer taxes and whatnot, though the reason
is immaterial). State law says he is not the owner.
Additionally, if he truly meant to go through the Chapter
13 process, and not simply use the stay as a weapon to
avoid collections efforts, he would likely have filed and
contacted my office before today.  I am sure you will
capably represent your client and his interests. But my
intention based upon the case law reviewed is to proceed
with a validly noticed sale.

The foreclosure sale proceeded on April 11, 2019.  On April 14, 2019, Tate commenced this adversary proceeding, and on April 19, 2019, Tate filed an amended complaint (Dkt. No. 7) seeking declaratory relief voiding the foreclosure sale and damages for violation of the automatic stay.

The amended complaint alleged that Tate had an equitable interest in the Property but failed to allege that Tate was his mother's heir.  Accordingly, upon consideration of the defendants' *Motion to Dismiss* (Dkt. No. 19) regarding Tate's amended complaint, the court issued its *Memorandum Decision and Order re Motion to Dismiss and Directing Plaintiff to Provide a More Definite Statement* (Dkt. No. 28) directing Tate to provide a more definite statement of the basis for his claimed equitable interest, but ruling that if Tate had a prepetition equitable interest in the Property as his mother's heir, then such an interest would be a valid basis for the relief sought in the amended complaint.  Thereafter, Tate filed a second amended complaint (Dkt. No. 32) providing the requested detail by alleging the he is his mother's heir.  In response, the

5

defendants filed an answer (Dkt. No. 34) to the second amended complaint in which they conceded that the debtor had an equitable interest in the Property and agreed to unwind the foreclosure sale.

On August 6, 2019, the defendants filed a *Motion for Summary Judgment*, and on August 13, 2019, Tate filed his opposition which included a motion that summary judgment be entered in his favor as to the issue of whether there was a willful violation of the automatic stay (Dkt. No. 37). In its *Memorandum Decision and Order re Motions for Summary Judgment* (Dkt. No. 46), the court dismissed Tate's request for declaratory relief as moot and ruled in Tate's favor that the foreclosure sale constituted a willful violation of the automatic stay. However, the *Memorandum Decision and Order re Motions for Summary Judgment* did not resolve the following issues: (1) the issue of mitigation of damages; (2) whether and to what extent punitive damages should be awarded; (3) the reasonableness of fees sought; and (4) the defendants against whom sanctions should be awarded. The court now addresses these issues in turn.[1]

---

[1] Tate also filed a motion to compel discovery (Dkt. No. 55), which the court granted (Dkt. No. 76). The court has already separately addressed Tate's application for fees and costs (Dkt. No. 77) arising from that motion in its *Order Fixing Fees for Successful Motion to Compel* (Dkt. No. 91).

II

MITIGATION OF DAMAGES

In response to defendants' argument in their *Motion for Summary Judgment* that Tate breached his duty to mitigate damages, the *Memorandum Decision and Order re Motions for Summary Judgment* noted that it was unclear how Tate failed to mitigate damages. As described above in the factual summary, the defendants proceeded with foreclosure auction despite direct notice from Tate's counsel to Fellner that Tate had filed the petition commencing Tate's bankruptcy case and that he had an equitable interest in the property as his mother's heir.  The defendants have not articulated what other course of action Tate should have taken after the defendants proceeded with the sale.  To the contrary, as noted in the *Memorandum Decision and Order re Motions for Summary Judgment*, upon the filing of the complaint commencing this adversary proceeding, the defendants did not unwind the foreclosure sale, but instead argued that the Property was not part of Tate's bankruptcy estate.  This suggests that, absent the court's having ruled against the defendants as to Tate's interest in the Property, any further efforts outside of the commencement of this adversary proceeding would not have been successful.  As the court stated in *In re Voll*, 512 B.R. 132, 142 (Bankr. N.D.N.Y. 2014):

> the [creditor] elected to oppose Debtors' motion on the
> basis that no violation of the automatic stay occurred,

7

thereby requiring Debtors' counsel to prove the
violation.  It did not, in contrast, acknowledge the
violation and limit its arguments to issues of mitigation
of damages.  Had it done so, the court would take more
seriously the contention that a mere phone call was all
that was reasonably necessary to resolve the matter.

Because "creditors may not deny that a violation of the stay was

willful then, after forcing the debtor to litigate the matter,

baldly claim that debtor-counsel's fees were unreasonable or

unnecessary," *id.* (*citing Duby v. United States (In re Duby)*, 451

B.R. 664, 677 (1st Cir. B.A.P. 2011)), I reject the defendants'

argument that attorney's fees ought to be reduced due to a

failure of Tate to mitigate damages.[2]

### III

### PUNITIVE DAMAGES

Tate has filed a motion seeking punitive damages (Dkt. No.

---

[2] In addition, the defendants' *Motion for Summary Judgment*
stated: "At no time prior to filing all these cases and
amendments and complaints did Plaintiff ever furnish any
substantiating case law."  *See also* the 8:27 p.m. e-mail on April
10, 2019, in which Fellner responded to Ammerman by stating: "Per
my earlier comments, it is our position that your client has no
interest in this property.  You have provided no citation
otherwise."  However, the defendants' *Motion to Dismiss* cited
*Richardson v. Green*, 528 A.2d 429 (D.C. 1987) and *Douglas v.
Lyles*, 841 A.2d 1 (D.C. 2004), the primary cases interpreting the
effects of D.C. Code § 20-105 and its effects on an heir's
interest in property, and argued erroneously that § 20-105
deprived Tate of any interest in the Property.  In other words,
when finally presented with the relevant citations in D.C. case
law, the defendants continued to argue that Tate did not have an
interest in the Property.  Accordingly, I do not find it credible
that Ammerman's failure to provide a specific citation to the
D.C. Code or to case precedent would have averted the foreclosure
or constitutes a failure to mitigate damages.

53).  "[A]n individual injured by any willful violation of a stay
provided by this section ... in appropriate circumstances[] may
recover punitive damages."  11 U.S.C. § 362(k)(1).  "Courts have
adopted various standards for determining whether 'appropriate
circumstances' exist, but appropriate circumstances ordinarily
are those in which the 'creditor has demonstrated egregious,
vindictive or intentional misconduct.'"  *In re Ojiegbe*, 539 B.R.
474, 480 (Bankr. D. Md. 2015) (citing *In re Clayton*, 235 B.R.
801, 811 (Bankr. M.D.N.C. 1998)).  For the following reasons, the
court does not find punitive damages to be appropriate under the
circumstances.

Conduct After the Filing of the Petition and Before the
Unwinding of the Foreclosure Sale.  Based on the record before
the court, including the e-mail exchanges between Fellner and
Ammerman on April 10, 2019, and the arguments raised in the
defendants' motion to dismiss, the defendants proceeded with the
foreclosure auction based on the erroneous belief that the
Property was not a part of Tate's bankruptcy estate, and
accordingly, was not subject to the automatic stay.  As the court
has noted in the past, "good faith is not a defense under
§ 362(k)," *In re Stancil*, 487 B.R. 331, 344 (Bankr. D.D.C. 2013),
and accordingly, in the *Memorandum Decision and Order Re Motions
for Summary Judgment*, I ruled that the defendants' violation of
the automatic stay was willful.  However, I find that under the

9

circumstances the defendants' actions based on this erroneous belief were not "egregious, vindictive or intentional" rather than undertaken in good faith based on the erroneous belief that Tate had no interest in the Property such that the automatic stay of acts to enforce a lien against property of the debtor or of the estate did not apply to the foreclosure sale.

Conduct Before the Foreclosure Sale of April 2019.  The motion for punitive damages argues that defendants' behavior during the pendency of the foreclosure proceedings of 2017 (which were cancelled) and 2019 (which resulted in the auction that violated the automatic stay) demonstrate that punitive damages are warranted.  The motion states:

> The deceitful behavior perpetrated against the debtor, which justifiably warrants punitive damages, was engineered by defendants' attorney Mr. Fellner and the condominium Board President [Clarence Hutton]. The email exchanges between Mr. Feller and the debtor, who was unrepresented at the time of the first of two foreclosure actions, demonstrate the unfair advantage attempted against the debtor.

Regarding the foreclosure set for April 2019, the motion for punitive damages alleges that the defendants intentionally failed to provide Tate with notice of the foreclosure:

> It can be surmised that [Fellner] intentionally omitted to provide notice of the foreclosure sale, scheduled for April 11, 2019, directly to the debtor. Mr. Fellner knew the notice was flawed because he knew that the debtor had an inchoate interest in the property.  Mr. Fellner's actions were calculated to deny the debtor his due process rights.

I disagree with this characterization of the exchanges and their

relevance to the question of punitive damages.

*First*, the exchanges highlighted in the motion for punitive damages relate almost entirely to the period before the commencement of Tate's bankruptcy case.  It is unclear why this conduct, which is characteristic of creditors assertively acting within their rights outside of bankruptcy context, ought to color the court's interpretation of the defendants' intent after the imposition of the automatic stay.

*Second*, the e-mails concerning the 2017 foreclosure proceedings reflect negotiations between Tate and Fellner, which resulted in the cancellation of the scheduled foreclosure after Tate tendered a $6,000 check (less than the $9,000 requested during negotiations).  If anything, these negotiations, and the cancellation of the foreclosure sale despite the failure of Tate to tender the entire $9,000 requested, undermine the argument that there was "unfair advantage attempted against the debtor."

*Third*, regarding notice of the 2019 foreclosure sale, as stated above in the factual summary, Ms. Tate remained the named owner of the property after her death, and presumably the notice was addressed in her name because the condominium association's records were not updated because her probate estate had not been administered and title had not been transferred.  In any event, Tate lists the Property's address as his address on the bankruptcy petition, and presumably he treated the Property as

11

his residence and would have received any notices that were sent to that address, even if they were addressed to Ms. Tate. According to the e-mail cited in the motion for punitive damages, Tate contacted Fellner on March 12, 2019, four days after March 8, 2019, the date listed on the notice of foreclosure ("Exhibit C" attached to the second amended complaint).  I accordingly reject the argument that "Fellner's actions were calculated to deny the debtor his due process rights."

*Fourth*, Tate has provided no further basis, other than this accusation, that Fellner "knew" that the notice was flawed because he "knew" the debtor had an inchoate interest in the property.  Moreover, based on the e-mail exchanges between Fellner and Ammerman on the eve of the foreclosure sale, Fellner's position (albeit mistaken) was that Tate did not have an interest in the property.  Absent any evidence rebutting the claim that this was Fellner's good faith mistaken belief, I reject the argument that the failure to provide notice of the foreclosure sale addressed to Tate instead of his mother was calculated to deprive him of his rights.

*Finally*, I note that the defendants' proceeding with the foreclosure while Tate was pro se is not in itself evidence of "unfair advantage attempted against the debtor."

Conduct During Discovery.  The motion for punitive damages argues that such damages are warranted due to failures to comply

12

with discovery requests during the pendency of this adversary
proceeding.  However, the court has already separately sanctioned
such conduct in its *Order Fixing Fees for Successful Motion to
Compel* and I determine that punitive damages are inappropriate
for such conduct, which in any event occurred after the
defendants had unwound the foreclosure sale.

Because I conclude that punitive damages are not warranted,
the time devoted to seeking punitive damages will be excluded
from the award of attorney's fees.  I will disallow the
attorney's fees for 8 hours spent on March 3, 2020
("Drafted/filed Motion for Award of Punitive Damages, Memo
Notice") and I will disallow 2.0 hours of the 6.0 hours spent on
March 15, 2020, regarding drafting and filing two documents, a
motion for summary judgment (Dkt. No. 64) seeking actual damages
and a motion for summary judgment (Dkt. No. 65) seeking punitive
damages.  The bulk of the 6.0 hours would have been required even
if only a motion for summary judgment regarding actual damages
had been filed, but 2.0 hours should be treated as applicable to
motion for summary judgment regarding punitive damages.
Accordingly, 10.0 hours of attorney time is disallowed as
relating to punitive damages.

IV

REASONABLENESS OF ATTORNEY'S FEE

Under § 362(k), a plaintiff "can recover as actual damages

only those attorney fees related to enforcing the automatic stay and remedying the stay violation . . . ." *Sternberg v. Johnston*, 595 F.3d 937, 940 (9th Cir. 2010).  The term "actual damages" is generally understood to limit fee awards under § 362(k) to those fees generated by those activities of the debtor's counsel that are "reasonable and necessary." *In re Prusan*, 495 B.R. 203, 208 (Bankr. E.D.N.Y. 2010) (citing *In re Robinson*, 228 B.R. 75, 85 (Bankr. E.D.N.Y. 1998)).  Having reviewed the most recent itemization of fees and costs submitted by the debtor's counsel (Dkt. No. 93), I determine that the following reductions and disallowances are appropriate:

- 4/10/2019 entry relating to the initial interview with the debtor and gathering of documents relating to scheduled foreclosure (4.00 hours).  This entry relates to work performed before the foreclosure sale of April 11, 2019, and consists of standard intake activities that are common to Chapter 13 cases.  I will disallow this 4.0 hours.

- 4/10/2019 entry relating to e-mail exchanges with Fellner (1.0 hour).  This work occurred before the foreclosure sale.  I will disallow this 1.0 hour.

- 4/19/2019 and 4/26/2019 entries relating to the amended complaint filed shortly after the initial complaint (3.00 hours).  The amended complaint is largely

14

duplicative of the initial complaint and I will
disallow these entries.

- 7/10/2019 entry relating to the second amended
complaint filed in response to the court's *Memorandum
Decision and Order Re Motion to Dismiss and Directing
Plaintiff to Provide a More Definite Statement* (2.00
hours).  The debtor was required to file this second
amended complaint to provide the court a "more definite
statement setting forth the basis upon which he claims
to have an equitable interest in the property" after
the *Memorandum Decision and Order* had already explained
that an interest as an heir would be an equitable
interest.  The second amended complaint alleged that
the debtor had an interest in the Property as heir of
his mother, the prior owner, who died unmarried and
intestate.  The task of preparing the second amended
complaint ought not have taken 2 hours.  I will reduce
this amount by 1 hour.

- 3/3/2020 application for fees (2.00 hours).  This
request for attorney's fees was filed an application
for fees.  This was not an application for a payment of
fees from the estate, which must be sought via an
application under Fed. R. Bankr. P. 2016.  The fees
sought were for actual damages under 11 U.S.C.

15

§ 362(k), and the fees could only be sought via a trial
or via summary judgment.  Eventually a motion for
summary judgment (Dkt. No. 64) regarding actual damages
was filed on March 15, 2020, with a renewed and updated
statement of fees incurred (Dkt. No. 65).  Awarding
fees for this initial statement of fees would be
duplicative.  I will disallow this 2.0 hours of work on
March 3, 2020.

- 3/3/20 "Doc # 53 Drafted/filed Motion to Compel
  Discovery" (4.0 hours).  The court has already entered
  an order (Dkt. No. 91) awarding fees for pursuing the
  Motion to Compel Discovery.  I will disallow this 4.0
  hours of work.

- 3/26/20 "Doc #77 Reviewed Order Granting Motion and
  filed Response" (1.5 hours).  This was the filing for
  fees as authorized by the order granting a motion to
  compel discovery.  The court has already entered an
  order (Dkt. No. 91) awarding fees for that work.  I
  will disallow this 1.5 hours.

- Nine hours of work relating to the defendants'
  counterclaim.[3]  As I explained previously (*see* Dkt. No.
  94), whatever the merit of that counterclaim, it was a

---

[3]  The time entries are 1.5 on 4/15/2020; 5.0 on 4/25/2020;
1.5 on 4/27/2020; and 1.0 on 5/03/2020.

claim based on alleged misconduct of Tate's counsel in
altering summonses.  It has a source independent of the
violation of the automatic stay and the time spent
responding to the counterclaim ought not be treated as
a damage proximately arising from the violation of the
automatic stay.  I will disallow this 9.0 hours.
Together, the above reductions total 35.5 hours.  Reducing the
91.05 hours in attorney's fees requested by that 35.5 hours
leaves 55.55 hours which the court determines to be reasonable.
Multiplied by an hourly rate of $400, this equals $22,220 in
attorney's fees.

Regarding attorney's costs, the *Order Fixing Fees for
Successful Motion to Compel* reduced the amount of costs requested
with the respect to Tate's motion to compel from $49.00 to $6.90,
in large part because the postage and printing costs were
excessive because the defendants are all represented by the same
counsel.  However, other than the application for fees that was
specific to the motion to compel (Dkt. No. 77), Tate's fee
applications (Dkt. Nos. 51, 62, 89, and 93) do not itemize the
specific sources of costs, some of which ought to be reduced as
excessive (such as superfluous printing and postage costs not
included in the application for fees for the motion to compel)
and some of which are fixed (such as internet search costs).  Due
to the lack of specificity, the court will reduce the remaining

17

request for costs by 50% to $150.50.  This results in total of
$22,370.50 in allowed attorney's fees and costs, in addition to
the fees and costs of $2,366.90 awarded by the *Order Fixing Fees
for Successful Motion to Compel.*

V

DEFENDANTS AGAINST WHOM SANCTIONS SHOULD BE AWARDED

Whether Tate's burden of proof on the issue of willful
violation of the automatic stay is a preponderance of the
evidence or (as in the case of civil contempt) clear and
convincing evidence, Tate has established that it is appropriate
to award the $22,370.50 in actual damages under § 362(k) against
Fellner and his client, Fairfax Village, the entity pursuing
foreclosure.  Fellner knew that Tate's mother had died intestate
and knew that Tate, as her son, was asserting through his
attorney that he had an inchoate interest in the Property.
Fellner did not challenge the representation that Tate had an
inchoate interest in the Property.  Instead, he treated the title
in the land records, which still reflected Tate's mother as the
owner, as negating Tate having a vested interest in the Property
pursuant to the inchoate interest.  He erroneously brushed aside
Tate's asserted inchoate interest in the Property (arising from
Tate being an heir) as only a potential interest in the Property
unless and until the Property was deeded to Tate.  Having been on
notice of Tate's asserted interest in the Property and on notice

18

of the bankruptcy case, he willfully violated the automatic stay
by proceeding to foreclose on the Property in which Tate had a
vested ownership interest.  *See Hanna Coal Co. v. I.R.S.*, 218
B.R. 825, 830 (W.D. Va. 1997) (IRS had reason to know that the
equipment it was selling belonged to the debtor, and being aware
of the bankruptcy case, willfully violated the automatic stay by
its selling the equipment to collect tax obligations of another
entity using the equipment in its mining operations).

Because Fellner was acting as Fairfax Village's agent,
Fairfax Village has similarly willfully violated the automatic
stay.  "Under general principles of agency law . . . a
creditor-principal is liable under § 362(k) for the acts of an
agent who willfully violates the automatic stay taken when those
acts are within the scope of their principal-agent relationship."
*In re Theokary*, 444 B.R. 306, 323–24 (Bankr. E.D. Pa.).

However, I will not award such damages against the
auctioneer, Alex Cooper Auctioneers, Inc., and the other three
remaining defendants, who are EJF Real Estate (Fairfax Village's
property manager), David Hahn (an agent of EJF Real Estate), and
Clarence Hutton (an agent of EJF Real Estate, and president of
Fairfax Village's board).  Unlike Fellner, nothing (including in
the allegations of the second amended complaint or in the facts
admitted via Tate's request for admissions of fact) shows that
these defendants were privy to Fellner's knowledge that Ms. Tate

19

had died intestate, that Tate is her son, and that in claiming an inchoate interest in the Property he was acting consistent with being her heir as to the Property even if the Property remained of record in his mother's name in the land records.  Accordingly, these defendants were not on notice giving them reason to know that Tate had an interest in the Property.  Even if these defendants became aware of the bankruptcy case, and were involved in the intentional act of foreclosing on the Property, that alone does not establish a willful violation of the automatic stay: if they did not have reason to know that Tate had an interest in the Property, they did not willfully violate the automatic stay.

Moreover, in contrast to Fellner, whom the caption lists as a defendant "individually and trustee for Fairfax Village I Condominium I Association Inc.," Tate's caption for the second amended complaint does not list Hahn and Hutton as defendants individually, and it is appropriate to treat them as defendants sued only in their capacity as agents of defendants Fairfax Village and EJF Real Estate.

VI

CONCLUSION

For the foregoing reasons, as will be reflected by a judgment that follows, it is

ORDERED that Tate's supplemental application for actual damages (Dkt. No. 93) pursuant to 11 U.S.C. § 362(k) will be

20

granted against Fellner and Fairfax Village as follows: Tate is entitled to reasonable attorney's fees and costs of $22,370.50, consisting of $22,220 in allowed attorney's fees and $150.50 in costs.  It is further

ORDERED that Tate's motion for punitive damages (Dkt. No. 53) is DENIED, and attorney time devoted to the motion is disallowed.  It is further

ORDERED that no damages will be awarded against the other defendants.

[Signed and dated above.]

Copies to: Recipients of e-notifications of filings.

R:\Common\TeelSM\Judge Temp Docs\Tate v. Fairfax Village - MemoDeciding Case on Undisputed Facts.final